U.S. District Court Southern District of Illinois

NO. 22-10-JGP
Judge J. Phil Gilbert
Williamson County, Il.

I. MR. Flournoy, Michael
        V.
Warden D. Sproul; Capt. C. Davis; J. LeClair; C. Brooks; S. Hendrickson; K. Mitchell; M. Daun; F/s. Lance; S. Holmes; Sis. Huckelberr; M. Schneder; J. Jarrett; J. Riley; D. Lennon; A.W. Sosa; B. Meigs; Brandon Harris; Byram; A. Moulton; R.N. J. Huges; Ms. Webb; K. Smiley;

II. Basis of Jurisdiction: Federal Question.
III. Citizen ship of Principal Parties: Citizen of this state.
IV. Nature of Suit: 550 Civil Rights; 555 prisoner conditions; 560 Conditions of confinement.
V. Origin: Original Proceeding
VI. Cause of Action: 28 USC 1331
    Brief description of Cause: Retaliation for exercising First Amendment, Freedom to practice Religion, Right to Access Courts, Right to complain against Federal officials; Denial of medical Attention.
VII. Requested in complaint:
    Demand: $85,000.00 each defendant
    Jury demanded: yes
VIII. Related cases: none

    /s/: Mr. Flournoy, Michael 44862-424
                03/01/2022
    USP Marion
    P.O. Box 1000
    Marion, Il. 62959.

1. Daniel Sproul. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as Warden/CEO. He is legally responsible for the operation of Marion FCI and camp, including but not limited to; the welfare of all inmates and staff; ensuring effective informal resolution procedures are in place; ensuring good faith attempts of grievance procedures don't operate to limit inmate access to formal filing of grievances; acknowledge receipt of grievance request or appeals by returning reciept to inmate; ensuring due process of SHU custody, reviews, and processing; and ensuring all inmates recieve fair access and treatment through medical/Health Service.

2. AW. J. LeClair. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as Assistant warden of programs and/or opperations, as directed by warden. His rank is established by the warden over the 'Programs Dept.' and/or 'Opperations Dept.', and is legally responsible as supervisor of Marion FCI's administrative programs and/or security opperations, as directed by warden, including its camp.

3. AW. Sosa. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as assistant warden of programs and/or opperations, as directed by warden. Her rank is established by the warden over the 'Programs Dept.' and/or 'Opperations Dept.', and is legally responsible as supervisor of Marion FCI's administrative programs and/or security opperations, as directed by warden, including its camp.

4. Captain C. Davis. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as Captain. He is legally responsible for the operation/security of Marion FCI, and for the camp, ensuring due process of SHU placement/review; effective processing and investigations of staff misconduct; fair treatment of inmates and enforcement of the oath of office.

5. M. Daun. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint, held an un-known rank relating to R&D office/unit team officers of Marion FCI. Daun's supervisor responsibilities are unknown to Plantiff at this time but will become known throughout discovery.

6. Byram. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as Acting

①

Unit Manager/CMC. She is legally Responsible (As the administrative head of the general unit team(s) of Marion FCI; overseeing all unit programs/activities; Chairperson of the team which comprises of unit manager(s), case manager(s) and counselor(s); Responsible for Review of team decisions prior to submission to warden; and compliance with Federal law/BOP policy.

7. J. Polley. Is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held Rank as case manager. He is Responsible for all case work services; prepares classification material, progress reports, Release plans, correspondence and other materials Relating to inmate commitment; serves as liaison between inmate, Administration, community and may chair unit Discipline committee (UDC); ordinarily present during initial classification and subsequent Reviews.

8. J. Jarrett. Is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held Rank as Correctional Conselor. He is Responsible for ~~the case~~ providing counseling and guidance for inmates of the camp in areas of institutional adjustment, personal difficulties and plans for the future; plays leading Role in segments of unit programs Relating to inmate activities, job placement, bed placement and visiting approval; may conduct counseling groups in unit and/or groups open to general population; providing "Appropriate Form(s)" for grievance to inmate(s); logging grievance in at time inmate gives grievance to him.

9. Lts. J. Brooks. Is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held Rank as lieutenant. He is Responsible for various aspects of institutional security Assigned to him by Captain.

10. S. Hendricksen. Is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint held Rank as SHU. lieutenant. He is Responsible for all aspects of SHU housing, placement, Review, policy/Due process, as well as any other duties directed by the Captain.

11. K. Mitchell. Is a correctional officer of the BOP subject to its oath of office, who at all times mentioned in this complaint held Rank as SIA/SIS. lieutenant. She is Responsible for various aspects of investigation(s) of inmate(s) and/or staff misconduct; and is the supervisor for all SIA/SIS correctional officers. Mitchell handle(s) various other aspects of administrative action(s) and/or institutional security assigned to her by Warden/Captain.

②

12. M. Schrader. Is a Correctional Officer of the BOP, subject to its oath of Office, who at all times mentioned in this complaint, held RANK as a Correctional Officer of the SIS Office. He has Responsibilities/Duties of, but not limited to; daily supervision of inmates, enforcement of Rules, Regulations, Safety, Security, and investigations into violations of BOP Rules; in Regular contact with inmates and encouraged to establish professional Relationships that dont interfere with his primary duties, and conducts Regular Searches for contraband.

13. Huckelberry. Is a Correctional Officer of the BOP, subject to its oath of Office, who at all times mentioned in this complaint, held RANK as a Correctional Officer of the SIS Office. He has Responsibilities/Duties of, but not limited to; daily supervision of inmates, enforcement of Rules, Regulations, Safety, Security, and investigations into violations of BOP Rules; in Regular contact with inmates and encouraged to establish professional Relationships that dont interfere with his primary duties, and conducts Regular Searches for contraband.

14. D. Lemon. Is a Correctional Officer of the BOP, subject to its oath of Office, who at all times mentioned in this complaint, held RANK as SHU property Officer. In addition to basic duties as C/O, he is Responsiable for making sure inmates who enter SHU recieve personal property transferred from general population based on their SHU status (administrative/segregation), and for the custody of inmates property while they are in SHU - Including but not limited to the safe keeping thereof

15. B. Meigs. Is a Correctional Officer of the BOP, subject to its oath of Office, who at all times mentioned in this complaint, held RANK as C/O. He has direct Responsibility for daily supervision of inmates; enforcement of Rules, Regulations, Safety, Security, and sanitation Responsibilities in the unit, in Regular contact with inmates and encouraged to establish professional Relationships that dont interfere with his primary duties; controls movement in and out of unit and conduct Regular Searches for contraband.

16. Brandon Harris. Is a Correctional Officer of the BOP, subject to its oath of Office, who at all times mentioned in this complaint, held RANK as C/O. He has direct Responsibility for daily supervision of inmates; enforcement of Rules, Regulations, Safety, Security, and sanitation Responsibilites in unit; in Regular contact with inmates and encouraged to establish professional Relationships that dont interfere with his primary duties; controls movement in and out of unit and conduct Regular Searches for contraband.

(3)

17. Ms. Webb. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint, held rank as C/O. He has direct responsibility for daily supervision of inmates; enforcement of rules, regular contact with inmates and encouraged to establish professional relationships that don't interfere with his primary duties; controls movement in and out of unit and conduct regular searches for contraband.

18. K. Smiley. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint, held rank as C/O. He has direct responsibility for daily supervision of inmates; enforcement of rules, in regular contact with inmates and encouraged to establish professional relationships that don't interfere with his primary duties; controls movement in and out of unit and conduct regular searches for contraband.

19. Mr. Lance. is a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint, held rank as Food Service Supervisor. In addition to regular duties as C/O, he supervises inmates who work in kitchen detail; ensure that BOP nation wide menu is followed, and inmates who recieve special diets are fed daily.

20. S. Holmes. is to plaintiffs knowledge a correctional officer of the BOP, subject to its oath of office, who at all times mentioned in this complaint, held rank as institution chaplain. He is responsible for various Religious services for all faiths; not limited to, special orders, approvals, submissions, and outside contractor services. The chaplain may also have other duties/responsiblites that are unknown to plaintiff at this time.

{ All defendant(s) are named in this complaint, having joined at different times, in retaliation against plaintiff for taking lawfull actions consistant with BOP rules and procedures. }

*

21. A. Moulton. is to plaintiffs knowledge a correctional officer of BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as medical staff with unknown duties.

22. J. Huges. is to plaintiffs knowledge a correctional officer of BOP, subject to its oath of office, who at all times mentioned in this complaint held rank as medical staff with unknown duties.

This complaint does not contain all of the dates/times of events, or supporting documents because Defendants have restricted Plantiff's access to his personal Property and/or copies thereof by placing him in Special Housing Unit under Segregation status. Plantiff intends to Amend this complaint as soon as he is able, And As defendants Join this cause.

1. Mr. Flourney brings this action against defendants named herein in their individual capacity, being that Federal law And BOP Policy does not authorize defendants conduct.

2. Plantiff was transferred to Marion Federal Prison Camp From Milan FCI as the Result of a civil action filed against (13) BOP Staff members in July 15th, 2021. With due dates pending in His criminal case and Flourney v. Hemingway et al., Plantiff caused Relevant copies to be Forwarded to Him, Requesting access to Marion's law library. M. Daun, who works many possitions in the administrative building, let Plantiff know she is not a Fan of inmates who seek to hold staff Accountable For Rogue Acts in Person by saying so, and in action by Flagging His mail preventing His timely Replies.

3. Plantiff was made to sleep on the floor in a one man cell with another inmate in a special housing unit while open cells were available for 15 days, even though He was fully vaccinated. M. Daun Recieved Mr. Flourney's Medical complaints And made sure All other inmates were seen by medical And had team Reviews except for Him.

4. Plantiff has Recieved the BOP Certified Religious diet in each institution He has been in since 2014 leading up to His placement in Marion camp. Daun made Sure He only Recieved the meals on two days For lunch, which were days set For administrative staff weekly walk through. Once Released From SHU, no longer under Daun's direct supervision, Plantiff pursued His legal matters and spoke to Chaplain Harmon About the Religious diet. Harmon informed Plantiff "the meals have to be ordered. Check with Food Supervisor to see when they Are in."

5. Plantiff Checked with Food Supervisor Lance each day for one month and the Food was never ordered. Mr. Flourney Asked the inmate(s) cooks About the Religious diet And was told "staff dont like to make the trays And every inmate who has Requested it has been targeted and kicked out of camp." Plantiff ordered Food From commisary for (5) months, avoiding the kitchen and Lance to avoid being kicked out of the camp, And declined M. Daun's invites to pick a fight.

6. Plantiff has taken all of the classes offered at Marion camp and maintained His Job as a night camp Driver, while keeping up with His legal studies on more than one occasion, Plantiff has had problems Recieving His mail (legal Research/Books) that was sent through Private Paid Services, via.

postage tracking.

7. In November 2021, Plantiff Filed a Reply to Warden Hemingway's brief (Milan FCI). A Filed copy was next day mailed to Plantiff to be checked for corrections. Defendants held mail 5 days after reciept, preventing Plantiff from making corrections asap and benefitting from the next day mail service. Plantiffs last (3) packages were all delivered to Marions PO Box on Sunday, (different Sundays). Each package was held for 5 days and delivered on the fifth day after complaining each time. M. Daun is in charge of mail room to Plantiffs knowledge and has taken a personal interest in his litigations outcome.

8. In December 2021, Plantiff was informed that Lance was leaving Food Service on Jan. 1st, 2022. On or about Dec 14th 2021, Plantiff Requested the Halaal Religious diet from Chaplain S. Holmes. Defendant Holmes said "Harmon was supposed to interview you and said you didn't want the meal." Plantiff Replied He, "was never interviewed and didn't say that." When asked if Harmon quoted Plantiff, Holmes said "Lance told Harmon you said it." Plantiff Replied He "never spoke to Lance and was counseled not to speak to him by other inmates," and that He, "was requesting the meal because Lance was leaving the camp and (He) didn't want any trouble for getting the Halaal meal."

9. Holmes Re-interviewed Plantiff for Halaal meal and told Him he, "couldn't find any reason to deny you the meal. For some reason 'they' dont want the meal at the camp." ① Footnote. On the next day, Lance called Plantiff into his office and confronted Him about the conversation He had with S. Holmes stating, "why am I getting chewed out about you not getting your meal?" Plantiff told him He, "was requesting the meal because he (Lance) was leaving. If its a problem let (Me) know because (I) dont want any problems." Lance said "the meals would not be ready until Sunday (12/19/21)." It was evident from Lance tone/body language, S. Holmes told Lance about their conversation in a negitive manner.

10. Moments after Plantiff returned to His cube, all inmates were ordered to do the same, then ordered into TV Room for institutional shakedown. About 4hrs later, all inmates were released. While cleaning His cube, C/O J. Smith "Smitty," ordered Plantiff to his office. Smitty told Plantiff, "you dont have a incident but SIS Huckelberry and Schneder said you have to report to Admin. building, not to get a ride - you have to walk."

11. Plantiff returned to His cube, got dressed and complied with the direct order. Once there, M. Schneder ordered Him, "wait in front of the door until we park." Plantiff was followed by SIS staff in Schneder's private pick-up truck while He walked. Schneder then asked Plantiff "what did you do?" He replied, "nothing, I know how to stay out of the way."

Schneder said, "we are going to get you all the way out the way." Plantiff Turned to look at him to see if he was joking and was told not to "look at me and dont say shit to me, turn around." Byram was talking to Plantiff about halfway house while he was waiting. Schneder told her that she "didn't have to worry because he was going to be some paperwork she don't have to do."

12. Schneder then searched Plantiff, handcuffed him and took him into Admin building where A.W. J. LeClair was told Mr. Flourney was a "(22) twenty two", and Dawn greeted him shaking her finger in his face, before he was taken to the lieutenats office. Once inside, Plantiff was greeted by Chaplain Holmes before Its. C. Brooks told him, "State your name and number". After complying, Brooks asked Plantiff "if he knew why He was here?" Plantiff said "No". Brooks then told Huckelberry, "why don't we take Him to STU until He figure out what He did." Holmes walked out of the office and excorted Plantiff to STU with SIS staff. Plantiff kept his mouth closed and followed all instructions until he was locked in STU under Administrative detention.

13. Plantiff Requested Administrative detention order (ADO) From all staff daily, including Brooks and Hendricksen, and was told each time they'd "look into it." Federal Regulation and BOP policy Required staff to give Plantiff ADO upon entry of STU as notice of why He was there, and allows 24 hrs to give him any incident Report. About (4) days later, Brooks on 12/19/21 said, he "wasnt the person in charge of placing (Him) in STU." Two days later on 12/21/21, Hendricksen said "A security threat was verified on you and you are being shipped." When asked "what does that mean?", Hendricksen Replied, "you are a threat to someone or they are to you." Plantiff Requested "Something in writing" and was told by Hendricksen, "It would be looked into". ② Footnote.

14. On 12/22/21 Plantiff questioned Byram about his STU status, she said, "you're here for SIS, I cant do anything until they give me a Report. What they say, has to be signed off on by the warden." On or about 12/24/21 J. Polley told Plantiff He's been "Checking the system for you since you've been back here and there is no incident Report, investigation, or notes on why you are here, you must've pissed someone off!" Plantiff then told Polley about the mail Request(s); Religious diet and law suit from the other institution against (13) BOP staff. Polley Justered as if to say, "there you have it."

15. Administrative detention is "non-punitive" and affords inmates certin/ limited property and Rights not afforded to inmates in segregation status. Plantiff Requested these items (books, hygiene, Religious, Legal work) from STU property officer Lenon. D. Lenon said, "you not getting any of the Administrative detention § 541(h)(3) personal property," you can write down whatever policy you want, Im not giving you anything in writing, Im

Telling you no!" These actions taken by defendant(s) placed Mr. Flourenry in "OFF the Record Segregation status," making His stay Unofficial Punishment."

16. Plantiff has complained to medical staff in person and by written Request/sick call to be seen so He can show the Doctor His skin, eyes and Nose, hoping to avoid another surgery while in BOP. At the time of this Draft (3/1/22) He has not been seen. Plantiff has not had a full nights Rest due to, but not limited to, consistant noise, extra bright lights, lack of fresh air, and breathing/chest pains. The lack of sleep is affecting His thoughts, mental health, basic processing, writing this complaint/Reading books, and His faith in God and justice.

Complaints have been made for open sores in His skin, cronic eye Allergies, Chest pains, and Request for EKG shan(s). Defendants controll the flow of information and treatment for SHU inmates and have Refused to allow Access to medical treatment and supplies to avoid having the deterioration of His health/mental health documented.

17. On 12/29/21, C. Davis came for the first time of Plantiff's stay, with D. Sproul. Plantiff appealed to both about being in SHU without incident or (7) day Review hearing where, "SHU records, All staff memoranda, and investigatory memoranda is presented/reviewed to justify Release or investigatory holding in SHU. Sproul stated, "You want the captian, I dont have time to talk About all the crap going on at the camp". Davis stated, "who are you?" After Replying, Davis stated, "OH, you Just got here", and laughed before walking Away.

18. On 12/31/21, Polley (case manager) said he, "checked (His) file and nothing is in there as to why you are in SHU. no investigation, incident Report or notes". Plantiff Requested a transfer to NCC Chicago's work Cadre, Rochester's work cadea, or Thompson Federal camp." This Request was in writing and was intended to give the administration cause to transfer Mr. Flourenry without falsifying a Reason. Polley said he'd "Submit it."

19. Later on that day, Plantiff used SHU law library for the first time. The Electrical system Allows emails to be sent to "SIS". Plantiff sent email to Defendant SIS. Lt. K. Mitchell on 12/31/21, Asking about His SHU status and Complaining that the process used to hold Him In SHU violated His due process Rights. Mr. Flourenry used a hand-written Request copy for this Email.

20. On 01/02/22 Polley was asked about the status of the transfer Request And Replied, "I'm going to email SIS to see what they are going to do with you. Plantiff complained He's, "getting the Run Around on all Request to medical, matters concerning His SHU status, and Recieving His legal work. All of

which is leaving (him) in STU without any answers or results. If there is no reason in your records as to why I'm in STU, then on paper Its like I'm not in STU. I need a written Reply so I can appeal it." Polley again agreed to submit the transfer request but refused to give anything in writing.

21. On 01/03/22, Polley returned and gave Plantiff a copy of his computation sheet. This is the first document that showed Mr. Flowrey was in fact in STU. Later this same day, Defendant D. Lenon was asked about the status of the requested personal property. Lenon said, "the final answer is no." Plantiff then gave him a written request to send all of his legal documents and pictures home, Explaining that His "Family will have Access to the legal documents and be able to locate/submit copies as needed for any pending litigation".

22. After submitting the same request(s) to be seen by the Doctor and recieve medication for his eyes/skin, on 01/04/22 A nurse came and checked Plantiffs blood pressure. The nurse said, "The doctor will come when they get the chance, I'm sorry."
Later that day, Jarrett (counslor) came to see another inmate. When he past Plantiffs cell he was asked about "the status of his legal work request." Jarrett Replied, "I will look into getting your legal work if Lenon can pull it out."

23. On 01/05/22, Administrative officers did their weekly walk-through. Plantiff presented the same follow-up questions he never recieved answers for, about "STU status/Release, Access to legal work/property and medical." The following defendant(s) Replied: Davis stated, "you probally in here for bringing in contraband," then walked away. Byram stated, "we got SIS Report today, you are being shipped without incident. I sent the report to Polley." J. LeClare stated, "you are going to be here for a while." Each gave their Reply as if on the fly, and walked off afterwards. Giving no information, documents or written Reply.
Later that night, Defendant K. Mitchell came to speak to one of the "FCI" inmates. Plantiff listened and waited to speak with her. Mitchell was asked if she, "Recieved the email(s) He and Polley sent about His STU status and what He's being held/investigated for?" Mitchell stated, she "didn't get any emails about you, and is not aware of any investigation. We have 90 days we can hold you for."

24. Defendant(s) have Punished Plantiff absent Regard due process or incident, in Retaliation for exercising His Right to Access the court And seek Redress for actions taken by BOP staff, and the Right to practice His Religion, seeking the Halaal diet. Plantiff has not recieved any official statement/



documentation that He could use For Administrative Rememdy, and had not been able to Recieve Any of the Forms to Appeal/Complain About non-compliance with Federal Regulation/Bop policy. Plantiff Amailed a total of (32) letters to M.Law Group and His Family at His home Address. As of 01/06/22 His Family had Recieved one letter in the 21 days.

25. After Filing the First complaint, Plantiff Sought the correct spelling of defendants names and Re-wrote the complaint. On 01/09/22, a Final draft was placed in a Sealed envelope with certified mail postage/Return Reciept Form Attached, addressed to this Court and to M.Law Group. Defendant B. Meigs Returned with Plantiffs mail and ordered Mr. Floureny "to open them So (he) can Read them!" Plantiff complained that "Policy Allows mail going to Federal court/Attornies to be Sealed." Meigs then Stated, "I have to Read it to make Sure you Are not trying to sneek Anything into the prison." Plantiff turned the envolope over pointing to the Address Asking, "So you think the Court And a Lawyer is going to Read this And come here to sneak Something into STU?" Meigs Stated, "Eiather let me Read it or its not going out!" Plantiff unsealed both envolops and said, "this Violates My Rights And is not the First Legal mail I've Sent out without this order to open it From STU." Meigs Said, "I'm doing what I was told, do whatever you think you have to do."

26. On 01/10/22, Someone From medical came and Said She was the "PA" (no name tag). She Asked Some questions About the chest pains and said She would send "Someone to draw blood to check (my) thyroid And EKG."

Later that day, Polley Returned, stating "You Are being transferred to a higher Security. I didnt have Anything bad to say About you in the 409. The SIS Report is not Apart of the 409. You cant get a copy of Any of these documents to Appeal. You can do Administrative Rememdy saying You dont want to be Shipped." Plantiff complained He "hasn't been able to get Any Forms to File Anything," And Requested a Form From Polley. Polley said "I'll send JARRETT to bring you one." Policy Authorizes Plantiff to Recieve Administrative Rememdy Forms From Any unit team member.

27. On 01/11/22, JARRETT was asked About the Status of Plantiffs legal work, "Are you going to give me my legal work or has anyone said how Much (I) need to pay to send my property home?" JARRETT Replied, "I dont have Any Answers About that. I havent talked to Anyone!" Plantiff then Requested two BP-9 Forms and Recieved them. JARRETT Stated, "See if that helps," And walked Away.

28. On 01/12/22, Hendrickson was Asked "why cant I have my property if Im administrative detention inmate; why havent you given me

⑫

A ADO order; and why do you have me in a cell with a D.S. inmate?" Hendericksen Replied," Its my Right to do it. I dont have to give you legal work or anything - so Im not doing it. File what you want".

At this time Plantiff Filed two Administrative Remedy complaints. one Against JARRETT For using a scheme of lying to Plantiff weekly, saying he would get the legal work or look into it being mailed At Plantiffs expense, to prevent him from Filing complaints About His property; For not Replying to countless Request For Sec $54(h)(3) property; And preventing Plantiffs Access to court on other legal matters. Plantiff Requested For Relief that property be sent home at His expense and that JARRETT be Removed/Reported to OIG For Civil Rights Violations.

The other Form was used to send to Regional As a "Sensitive BP-9" by Certified mail. This complaint made known the unauthorized punishment/Due process Violation(s) that Marion FCI has practiced Against Mr.Flournay. Plantiff Requested For Relief, "Marion be stopped From being Able to SelF pick out who can/not be housed in its prison camp based on their RACE or Religion, as they've done with Plantiff, and that the matter be investigated/Forwarded to DOJ For False statements."

29. On 01/19/22 Plantiff became AWARE of A.W.SOSA As she was stoped/questioned by inmate Brown #39809-044 About why he'd been in SHU For so long without incident Report. Sosa told him that "his incident was being Reviewed by FBI For Prosecution and when they were done they'd proceed." AFter she Finished, Plantiff Asked About His SHU status, "Why Am (I) In SHU?" She Asked (my)name and said, "I dont Remember your name. Just a min. and I'll ask Byram". Byram said,"Look SIS, you ARE being shipped." Sosa was Asked "Why?", She Said, "Its in your DHO Report." Plantiff complained, "(I) don't have a incident." Sosa Said "then you'll be shipped to another Med. FCI." Plantiff said, "but (Im) From the camp." Defendant Dawn Enterjected, "He's going to a LOW FCI." Plantiff questioned "How is that possiable when (I) haven't done anything wrong?" Byram said, "the SIS Report must be bad and said you were doing a lot of stuff in the camp". At this stage Sosa walked Away. Plantiff complained "SIS Report is based on False evidence/statements, thats the only way (I) could not get a incident For its contents. (I) want to Appeal it and Request a investigation". Byram said, "theres nothing to Appeal. Its a SIS Report. You cant Appeal it or know why you ARE Getting shipped." Plantiff said "Its my Right to Appeal Any unit team decision. You ARE unlawfully Punishing (Me) based on False statements and won't Provide any documents". M.Dawn Stated, "You cant have Administrative Remedy Form

because you cant appeal anything. There is nothing for you to see." Plantiff gave Buram the BP-9 against Jarrett to be processed. Mr. Flournoy understand Defendant(s) were not going to give him any ADO order, as the (7) day time frame for the 24hr/Review hearing had past; (He) was not going to attend any Review hearing(s), (30) day or otherwise, because he was not in SHU for a lawful Reason; and He should not look to any labor policy/procedure - because whatever they are, they dont apply to him. As of 01/19/22, Mr. Flournoy was not approved for any transfer. The only thing consistent from day one was defendant(s) placed Plantiff in SHU without cause with intent to have him shipped to higher security.

30. On 01/22/22, Defendant Brandon Harris gave Plantiff A bogus incident Report that knowingly Relied on a false statement, on a official government form. The Report Alleged Plantiff was told to "Stand for count at 4pm, A total of (3) times and Refused the direct order." Plantiff did not know he had a incident until defendant Hendricksen gave him a copy. Plantiff complained that he "was never ordered to stand for count and Harris never said those words on A-Range. You (Lts) know SHU inmates are not told to stand for count." Hendricksen said, "tell it to UDC when they come." Plantiff Requested all inmates on A-Range as witnesses that Harris lied on the incident And the video to show S/O Platt counted Plantiff and kept walking." Plantiff Also said, "After talking to you (Lts) (I) know this bogus incident is in Retaliation for filing the civil action against you." Harris threatened Plantiff, "I'm not done with you yet!"

Defendant Hendricksen is the SHU lieutanet, Harris and Meigs supperuisor. Hendricksen had authority to not approve the incident and had personal knowledge it was false. Upon information and belief, Defendant(s) needed a incident against Plantiff to increase His custody points to transfer Him to higher security. Because Plantiff wouldnt violate rules on His own, Defendant(s) used Harris to create one after this complaint was made known through Meigs.

31. On 01/25/22, Jarrett and Polley came to do UDC for the incident Report containing the false statement. Jarrett/Polley should not have done UDC, being that Flournoy filed BP-9/civil suit against them, which was made known by other staff. BOP policy Allows inmate the Right to present evidence, witnesses and give statement on their behalf. Plantiff tried to give Jarrett His written statement/witness Request and Request for false statement investigation. Jarrett Rejected it stating, "I'm not reading that. You dont get any witnesses or evidence in this UDC. Its your word against his." Plantiff pled, "The whole A-Range is my witness that

he never said those words once, no % ever ask us to stand in SHU. Polley, you work down here and know that don't happen, the Report is False." Jarrett closed his Folder and said, "you're getting 30 days no phone!" Plantiff said, "your sanction was pre-determined because I filed that civil action and BP-9 against you for staff misconduct. Thats Retaliation, you Rejected My evidence, statement, witness, and Request for Investigation. (I) would like a BP-9 to appeal your sanction." Jarrett denied the Form so he Requested it From Polley, who also denied it stating, "you have to get it From your Counselor." Plantiff said, "you see he's refusing to give it to Me. Polley says (I) can get it From Anyone on unit team". Polley said, "Well thats wrong." Both defendants left without giving Plantiff the Form.

32. A few hours later on 01/25/22, Defendant Lenn allowed Plantiff to pick out items on his property sheet to be mailed home, but said, "R&D said they will not ship anything until its time for all of your property to be shipped", ie, His Family, or Him would not have Access to the legal documents For any pending litigation until He is Released From SHU or Transferred to another institution.

Shortly after on 01/25/22, Defendant Davis came to A-Range Ahead of ACA auditors. Plantiff complained About "the False statement, Retaliation, And being denied the appeal Form." Davis walked away, and Returned with a Rep. From the ACA, Sproul, and another staff member. Plantiff handed the Form to ACA Rep. ("UDC statement and Request For SIA/OIA False Statement Investigation." The ACA Rep. Read it then passed it to Davis. Davis stated he'd "look into it.

33. The next day on 01/26/22 C/O Fields gave Plantiff a BP-9 Form. Plantiff Filled out the Form Requesting investigation into the False statement and attached a copy of the "UDC statement" that was Rejected by Jarrett. On 01/28/22 Polley came to collect the Appeal, stating he, "would make sure this made it to the Secutary, And you get Reciept."

34. As of 02/02/22, Plantiff has not Recieved the certified mail Reciept(s) From Any Administrative Remendy Request that Confirm complaints were Recieved And processed. Based on the normal process time, indicate Plantiffs mail/complaints will not be processed or make it to its destination.

Upon information and belief, when defendant Meigs was ordered to have Plantiff open His legal mail and Read His Course of action with this Court And Request For help And the copies of His notes and inmate Request to Staff, Defendants became Fully Aware of His intent to hold them to account For deprivation of liberty without



due process of the law.

Upon information and belief, Riley submitted a 409 form that was rejected by DSCC, after which defendants agreed to use a false statement to give plaintiff a incident to increase his custody points causing Riley to submit another 409 to reflect the change. Defendants cannot justify having held Mr. Flurry in SHU, consistant with policy. The false incident could not have been given, if defendant(s) would've released plantiff into general population after DSCC rejected the first transfer.

35. On 2/2/22 (I) submitted a inmate request to Administrative Staff Supervisor(s); to R&D Supervisor Crawford and another to Education Sup. Owens to be processed. This request asked for Seperatee order(s) against Counsler Jarrett, C/O Brandon Harris and Lts Hendrickson in response to their acts of malice and retaliation dureing the month of Dec./Jan. 2022. This request was made again on 2/9/22 to Defendant Davis. The Seperatee is a process used in BOP by inmate(s)/staff against person's they feel threatened by, which acts as a restraing order to prevent the parties from coming into contact with eachother. At the time of this draft (3/1/22) contact has not been restricted. C/O Harris worked the whole month of Feb., doing institutional counts/passing out lunch trays. On 2/7/22, Harris and Lemon did count (10 am), and did not order any inmates to stand or give incidents for not standing. On 2/12/22 Harris took Plantiffs religious diet tray, and tried to force him to eat a regular tray, causing him to refuse a meal, consistant with the threat "I'm not done with you yet".

36. On 2/2/22 Plantiff made his (3rd) request to medical for A&D Ointment (2oz/56.6g), ammonium lactate 12%, and eye drops (all of which the BOP has provided for him or its equal as recent as 7/21). These request were made to Huges and A. Moulton of Marion Medical staff. For Plantiffs time in SHU, these two defendants have acted as "sick call nurse." Sick call is the BOP's system for inmates to make medical complaints/see PA/RN for relief at a $2.00 co-pay. Defendant(s) have both refused all of Plantiff's request, stateing that he could "buy items from commisary to give him the same/equal relief script meds could give". Both defendant(s) have refused to sign commisary slips authorizing the purchases, stateing "only the PA can authorize them." Both defendants have refused to forward Plantiffs request to PA/Doctor because they determined (I) can get "help from commisary".

37. Other medical staff have not agreed with these two defendants. McGee and Gibbs, and another medical nurse have signed/authorized

The purchase of prevention care products. Hendricksen (shults) has maintained that medical has to authorize prevention care products, but told Plantiff that he "couldn't get any until the captian provides a special stamp." He (shults) has been asked to assist in allowing Plantiff to maintaining His helth, has seen His scabbed lower body/scars and taken pleasure in them. As of 3/1/22 Hendricksen has not signed or told commisary, to provide the (3) items requested (antibac. soap; cocabutterjar; vasine eye drops), stating "If you need them medical can give them to you."

Plantiff has had a medical permit for custom arch supports since 0/19/14 and medical shoes since 12/4/19. Hendricksen would not let Plantiff have His shoes without Him producing the permit, and would not allow him access to His property to produce the permit. On 1/28/22 J. Hughes provided a medical Duty Status sheet that satisfied this request. Hendricksen made his own medical finding that "the shoes/arch supports were not needed" for Mr. Flournoy, but allowed another inmate to have them/theirs.

On 2/23/22 Plantiff complained that the actions of medical staff Hughes, Moulton and Hendricksen collectivly denied Plantiff medical care, And requested "petroleum Jell.; cocabutter jar; Viesine Allergy eye drops", from His property. Hendricksen said on 2/28/22 that he "was the captian for the day, and the answer was no."

38. On 2/25/22 Ms. Webb stop at (my) cell and told (my) cellmate that she "was not passing out any mail on A-Range because someone had called her a bitch and bitches dont pass out mail." On 2/26/22 the #1 morning c/o (no name tag) was asked by Plantiff to "check to see if there was any mail in the office." He returned and stated it was only "two books." After shift changed, Plantiff asked c/o Smiley to check "because Ms. Webb said she wasn't passing out any because someone called her a bitch." K. Smiley said "It was my idea, I said thats what I would do and pass it out on Sat." He said he'd check then later brought (me) a Flat Rate envelope marked "Legal Research Material" from M. Law Group. This mail had copies of complaints against Marion to OIA, Regional, And His "Second Amended complaint/motion." This document was filed with this court on 2/14/22 as (4) pages, which did not include the complaint that was mailed with it. Plantiff used the phone for 15 min.s on 2/28/22 for the first time since Dec. 21', And requested His wife to contact the clerk's office to see if by mistake they failed to scan/file it or if by process. Because Plantiff has recieved increased acts of malice, He is concerned [they] opened mail and took the complaint out. As such, He has Resubmitted the complaints with [their]



Additional acts.

39. Defendants placing Mr. Flournoy in SHU deprives Him of benefiting from provisions of FSA that went into law on 1/15/22, which would cause His immediate Release. Defendants took His phone to prevent Him From making the above denials Known and maintaining Family ties.

40. Defendants were all aware of Plaintiffs Right to File complaints against BOP staff and access the court. Defendants had no Reason to Read Plaintiffs legal/civil litigation to this court or Remove contents, except to obstruct normal processing and Retaliate. Defendants understood with holding cause For SHU placement violated BOP Rules and common law, but considered it worth while. Plaintiff was the only Muslim inmate (practicing) at Marion Camp before He was ordered to Report to Admin. building For SHU placement, until a way was decided to ship Him.

41. Defendant(s) knew Plaintiff had a Right to Recieve and eat the Halaal Religious diet in general population, absent incident or cause. Mr. Flournoy's Placement in SHU came less than 36 hrs after He disputed with Defendant(s) and being Approved For diet.

42. Defendants knew placing Plaintiff in SHU under the guise of a Sham SIS investigation would prevent Him From having contact with the world; stop Him From learning about policies/procedures that would cause meaningful litigation between Marion Administration, Himself, and other inmates as well.

Upon information and belief, the SIS investigation (If any) did not start until after 12/15/21 — after Plaintiff was placed in SHU. As of 3/1/22, no BOP staff has interviewed Mr. Flournoy Regarding any investigation; all have given misinformation or claimed they had no information as to why He was placed in SHU. No administrative staff has objected to Plaintiffs "Special treatment" or Reported the wrong Mr. Flournoy made them aware of. Each has taken a stance in support thereof and has increased the Retaliation, Knowingly.

Relief
1) Plaintiff Request $25,000.00 USC, in Actual damages From each defendant individually,
2) Plaintiff Request $60,000.00 USC, in Punitive damages From each defendant individually,
3) Plaintiff Request all other Relief this court deems just.
* Jury-trial Requested
Respectfully submitted,
/s/: Mr. Flournoy, Michael #44862-424
Marion FCI / Po Box 1000
Marion, Il 62959

Foot notes:

1. During the Re-interview, Mr. Flournoy was told He "would be subject to Random Reviews of His purchases and locker Searches to make sure He only bought Items consistant with His diet." Plantiff informed Holmes He's "strict on His diet and didn't have a problem with that." Holmes then Said "we have a email from a Muslim scholar who says Velveta Cheese may come from cow's thats not halaal and if you order it, you will be kicked off the diet." Plantiff informed Holmes, "I don't worship the scholars. My family does the research for me to make sure Im in compliance with any questionable foods. Cheese comes from dairy, ie. live cows and the preservatives used are plant based now-a-days. I don't put partners with God from the scholars or others. My Right to practice my Faith the way I see Fit is the First amendment of the U.S. Constitution. I will exercise that Right against the scholars."

2. BOP policy allows inmates up to 20 days after incident to File admin. Remedy Challenging it. Jarrett is the point person For these Forms at the time of this draft. Jarrett has denied Plantiff more than a Few forms and other unit team members have stated "Its not their Job or they dont have any." 9 of 10 Request to unit team members have gone unanswered. Defendants are all supervisors who have a intrest in their actions not becoming known. The Failure to give notice of why Plantiff is in SHU and all other acts in this complaint are Strategic.